# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| YOULIN WANG,<br><br>    Petitioner,<br><br>    v.<br><br>RICHARD KAHN,<br><br>    Respondent. | Case No.  20-cv-08033-BLF<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I. INTRODUCTION

Petitioner Youlin Wang brought this action to enjoin an arbitration which he claims was commenced without his knowledge or consent.  Respondent Richard Kahn initiated the arbitration under what he claims is a valid arbitration agreement between the parties.  Petitioner seeks injunctive relief to halt the arbitration, in which Kahn seeks payment of fees for the tax services provided in association with two real estate sales in Palo Alto, California (the "Arbitration").  In November 2019, Respondent Richard Kahn and Forensic Professionals Group USA, Inc. ("FPG") initiated the Arbitration to recover unpaid fees against Petitioner Youlin Wang, as well as Petitioner's former attorney Derek Longstaff.  ECF No. 1 ("Pet.") ¶¶ 24-25.  After learning of the Arbitration, Petitioner filed this action in the Northern District of California, seeking to enjoin Kahn and FPG from pursuing the Arbitration and to enjoin Longstaff from purporting to act on Petitioner's behalf in the Arbitration. Pet. ¶¶ 37-69.  The Court entered Default Judgment as to Longstaff.  ECF No. 107.  The Clerk entered default as to Respondent FPG.  ECF No. 110.  The Court granted Petitioner Wang a preliminary injunction temporarily halting the arbitration that was in progress.  ECF No. 45.  All that remains are two claims against Respondent Kahn.  Claim 1 is for a permanent injunction of the Arbitration pursuant to 9 U.S.C. § 206 on the basis that there

was no valid agreement to arbitrate. Pet. ¶¶ 37-44. Claim 2, brought in the alternative, is for a permanent injunction of the Arbitration pursuant to 9 U.S.C. § 206 on the basis of violation of the American Arbitration Association ("AAA") rules. *Id.* ¶¶ 45-56.

The Court held a bench trial as to the remaining two claims for a permanent injunction of the Arbitration against Respondent Kahn on April 10, 11, and 12, 2023. *See* ECF Nos. 202-04. Having considered the evidence and oral argument presented at trial, the Court makes the following findings of fact and conclusions of law.

## II. LEGAL STANDARD

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *Id.* "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

"One purpose behind Rule 52(a) is to aid the appellate court's understanding of the bases of the trial court's decision." *Simeonoff v. Hener*, 249 F.3d 883, 891 (9th Cir. 2001) (internal citations omitted). "The district court is not required to base its findings on each and every fact presented at trial." *Id.*

## III. FINDINGS OF FACT

1. Wang is a Chinese citizen and holds a Chinese passport. Tr. at 101:16-23.

2. In 2016 and 2017, Wang built two new single-family homes in Palo Alto, California, at 3878 Magnolia Drive and at 3880 Magnolia Drive. Tr. at 113:10-16, 176:1-10.

3. Wang subsequently transferred 3878 Magnolia Drive to a wholly-owned company, Magnoliadrhomes LLC ("Magnolia"). Tr. at 176:14-22.

4. Wang sold 3880 Magnolia Drive in late 2017 and 3878 Magnolia Drive in early 2018. Tr. at 179:1-7.

5. Because of his foreign citizenship, Wang had approximately $1.5 million in tax

withholding from the proceeds of the sales of 3878 Magnolia Drive and 3880 Magnolia Drive under the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA") and its California state law analog.  Tr. at 177:15-23, 178:9-14.

6. Wang could obtain a refund of these withholding amounts by filing his 2017 and 2018 state and federal taxes and requesting a refund of any withholding amounts that exceeded his tax liability.  Tr. at 178:18-25.

7. Guohua "Greg" Xiong ("Xiong") was Wang's authorized agent for Wang's U.S. business interests.  Tr. at 112:19-113:2, 175:3-16.

8. Xiong retained the services of Derek Longstaff ("Longstaff"), an attorney, to provide legal services in connection with the filing of Wang's 2017 and 2018 state and federal tax returns.  Tr. at 183:3-10.

9. Neither Xiong nor Wang authorized Longstaff to enter into any contracts on Wang's behalf.  Tr. at 114:1-6, 185:17-23.

10. Xiong understood that Longstaff would incur expenses to a tax preparer at a few thousand dollars per tax return, and that Xiong would have to reimburse Longstaff for these amounts.  Tr. at 186:4-187:7.

11. Xiong learned that Longstaff had asked Kahn to help with Wang's tax returns.  Tr. at 191:4-13.

12. On June 14, 2018, Xiong executed a limited power of attorney on IRS Form 2848 appointing Longstaff to act on Wang's behalf within the scope specified in the form.  Tr. at 184:20-185:2, 185:11-16; Pet. Ex. 26.

13. Xiong understood he was executing IRS Form 2848 for the purpose of allowing Longstaff to help file Wang's tax returns.  Tr. at 184:20-185:2.

14. Longstaff provided a copy of Wang's executed IRS Form 2848 to Kahn.  Tr. at 352:20-353:2; Pet. Ex. 34.

15. In a memorandum dated August 9, 2018, Kahn informed Longstaff that the IRS Form 2848 was not sufficient for Longstaff to enter into the transactions with Kahn's company, respondent Forensic Professionals Group USA, Inc. ("FPG"), on Wang's behalf, and that

Longstaff instead needed a general power of attorney.  Tr. at 356:11-358:2; Pet. Ex. 28.

16. On August 13, 2018, Longstaff sent Kahn a "Special" Power of Attorney" dated November 13, 2017 (the "November 2017 POA"), purportedly granting Longstaff broad authority to act on Wang's behalf on matters relating to the Magnolia properties.  Tr. at 358:13-22; Pet. Ex. 29.

17. The November 2017 POA purportedly from Wang to Longstaff was forged.  ECF No. 178 at 7:27-8:1; Tr. at 6:4-12.

18. On August 16, 2018, Kahn sent Longstaff an email attaching the Partially Deferred Retainer and Fee Agreement (the "PDRFA"), the Refund Disbursement Agreement (the "RDS," and together with the PDRFA, the "PDRFA Agreements"), and the November 2017 POA, so that Longstaff could sign the PDRFA Agreements on Wang's behalf.  Tr. at 366:10-25; Pet. Ex. 31.

19. The RDS contains the arbitration provision under which FPG and purportedly Kahn commenced the arbitration (the "Arbitration") that Wang seeks to enjoin.  Pet. Ex. 2; Pet. Ex. 16 at pp. 7-8.

20. Wang did not sign the PDRFA Agreements.  Tr. at 114:16-115:8.

21. Wang did not authorize Longstaff to enter into the PDRFA Agreements on Wang's behalf.  Tr. at 114:1-6, 117:3-5.

22. Xiong did not authorize Longstaff to enter into the PDRFA Agreements on Wang's behalf.  Tr. at 185:17-23, 187:12-20, 216:13-16.

23. On August 16, 2018, Longstaff purported to sign the PDRFA Agreements on Wang's behalf under the November 2017 POA.  Tr. at 348:17-21, 349:1-16, 351:5- 11; Pet. Exs. 1, 2, 31.

24. Prior to the time that Longstaff signed the PDRFA Agreements, Wang had never communicated with Kahn.  Tr. at 348:22-25.

25. Prior to the time that Longstaff signed the PDRFA Agreements, Wang had taken no actions to lead Kahn to reasonably believe that Longstaff had authority to enter into the PDRFA Agreements on Wang's behalf.  Tr. at 184:20-185:6, 348:22-25.

26. Prior to the time that Longstaff signed the PDRFA Agreements, Kahn did not

believe that Xiong was an agent or power of attorney for Wang. Tr. at 418:20-25, 419:3-5.

27. Longstaff did not inform Wang or Xiong about the PDRFA Agreements. Tr. at 193:21-194:11, 198:22-199:22, 215:11-19, 411:5-19, 414:17-23, 416:25- 417:12; Pet. Exs. 43, 62.

28. The PDRFA Agreements purport to give FPG a contingent fee interest in Wang's tax refunds. Pet. Ex. 1.

29. In August 2018, Luis Bulas-Felix ("Bulas-Felix") filed Wang's 2017 tax returns with the IRS and Franchise Tax Board. Pet. Exs. 22, 23.

30. In or about October or November 2018, Longstaff informed Xiong that Kahn wanted to meet with Wang in China to verify that Wang was a real business person. Tr. at 188:1-18.

31. Xiong was sent a copy of a document Kahn had drafted titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China" that Kahn wanted Wang to sign at the meeting in China. Tr. at 188:19-189:10; Pet. Ex. 13.

32. Xiong understood the power of attorney referenced in the document Kahn had prepared to mean the IRS Form 2848, as that was the only power of attorney Longstaff had been given on behalf of Wang. Tr. at 190:17-191:20; Pet. Ex. 13.

33. Xiong did not understand the document Kahn had prepared to give Longstaff any greater authority than Xiong had provided on Wang's behalf in the IRS Form 2848. Tr. at 191:14-20.

34. Xiong sent the document to Wang prior to the meeting in China and told Wang that he had reviewed it and that Wang could sign it. Tr. at 189:22-190:6.

35. Kahn traveled to Beijing and met with Wang in a hotel lobby for approximately 5 to 10 minutes on November 8, 2018, where Kahn gave Wang the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China," and had Wang sign it. Tr. at 115:9-23, 116:9-25; Pet. Ex. 13.

36. Longstaff forbade Kahn from showing Wang any documents other than the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China," at the Beijing meeting with Wang. Tr. at 394:10-395:4.

37. Kahn did not show Wang the purported November 2017 POA when Kahn met with Wang in Beijing.  Tr. at 116:13-23, 168:19-24, 384:24-385:17.

38. Kahn did not show Wang the PDRFA Agreements when Kahn met with Wang in Beijing.  Tr. at 116:13-23, 168:19-24, 385:18-23.

39. Kahn did not show Wang any contract containing an arbitration clause when he met with Wang in Beijing or notify Wang that Wang had agreed in prior documents to an arbitration agreement.  Tr. at 168:19-169:4.

40. Kahn did not tell Wang that by signing the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China," Wang was agreeing to arbitrate any disputes that arose between Wang and Kahn or Kahn's company.  Tr. at 168:25-169:4.

41. Wang believed the purpose of the meeting was to verify that Wang was a real person.  Tr. at 115:15-19.

42. Kahn did not discuss the content of the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China" with Wang at all.  Tr. at 160:17-161:2.

43. In February 2019, Bulas-Felix filed Wang's 2018 tax returns with the IRS and Franchise Tax Board.  Pet. Exs. 24, 25.

44. Longstaff gave Kahn a copy of another purported power of attorney from Wang to Longstaff dated February 1, 2019 (the "February 2019 POA").  ECF No. 190.

45. The February 2019 POA was forged.  ECF No. 190; Tr. at 486:2-10.

46. The IRS Form 2848 that Xiong provided to Longstaff on June 14, 2018, is the only power of attorney that Wang ever granted to Longstaff.  Tr. at 190:17-191:20.

47. After the sales of the Magnolia properties, Longstaff introduced Xiong to Joseph Libkey, Jr. ("Libkey"), who purported to offer a way for Wang and Magnolia to lawfully defer taxes if Wang transferred the proceeds from his Magnolia sales into a trust account under Libkey's control.  Tr. at 179:20-182:1.

48. Peak Financial is owned by Joseph Libkey.  Tr. at 179:20-24.

49. Libkey and/or Peak Financial opened a US Bank account under the name "Y

6

WANG PEAK" to hold the funds from the sale of 3880 Magnolia Drive in trust. Tr. at 521:1-19, 522:4-16.

50. Libkey and/or Peak Financial opened a US Bank account ending in -19238 that the $3,130,953.66 in proceeds from the sale of 3878 Magnolia Drive were transferred to on May 4, 2018. Tr. at 179:25-181:8, 518:10-519:11, 521:1-19; Kahn Ex. 142.

51. The US Bank account ending in -19238 identifies "Peak Financial Co." as the trustee and "Magnoliadrhomes LLC" as the beneficiary. Kahn Ex. 142.

52. Wang and Xiong had no control over the US Bank account ending in -19238. Tr. at 519:12-23.

53. Xiong discovered that Libkey had registered a company in Colorado named "Magnoliadrhomes LLC" that had no affiliation with Wang's California company with the same name. Tr. at 519:12-23, 523:19-524:5, 524:9-21.

54. The "Magnoliadrhomes LLC" associated with the US Bank account ending in -19238 is not Wang's California company with that same name. Tr. at 166:20-167:21, 519:12-23, 523:19-524:5, 524:9-21.

55. Peak Financial and Libkey controlled this trust account. Tr. at 180:15-181:8, 521:1-19, 522:4-22; Kahn Ex. 142.

56. Libkey was not authorized to transfer any money from the trust accounts holding the proceeds of the sales of the Magnolia properties without Xiong's direct, explicit authorization. Tr. at 181:16-182:1.

57. Libkey did not have discretion to spend the funds supposedly being held in trust. Tr. at 181:9-23.

58. Libkey was not authorized to negotiate with Kahn on Xiong's or Wang's behalf. Tr. at 203:24-204:1.

59. Kahn was aware that Wang had transferred $3,130,953.66 from the sale of 3878 Magnolia Drive into a trust account with Peak Financial listed as Trustee. Tr. at 507:5-508:4, 509:4-14; Kahn Ex. 142.

60. Kahn paid Libkey $17,000. Tr. at 364:14-17.

61.     In or around August 2018, two payments of $5,000 were wired to FPG's bank account, one from a US Bank account ending in -58579 identifying the originator as "Y WANG PEAK CO," and one from a US Bank account ending in -19238 identifying the originator as "MAGNOLIADRHOMES LLC."  Kahn Ex. 151.

62.     Kahn believed that Peak Financial was the trustee for the "Y WANG PEAK" account and that Libkey had made the payment as trustee for the sales proceeds from one of the Magnolia properties.  Tr. at 511:20-512:21.

63.     Neither Wang nor Xiong approved or had any knowledge of the two payments of $5,000 to Kahn.  Tr. at 117:7-15, 192:4-15, 198:1-13, 218:5-20.

64.     On or about November 19, 2018, $161,024 was wired from the US Bank account ending in -19238 to FPG's bank account.  Kahn Ex. 152.

65.     Neither Wang nor Xiong approved or had any knowledge of the transfer of the $161,024 to Kahn.  Tr. at 118:2-7, 166:20-167:21, 193:4-6, 198:1-13.

66.     In or around October 2018, the Franchise Tax Board wired a refund payment of $136,530 for Wang representing Wang's 2017 state tax refund to an account under Kahn's control.  Tr. at 192:16-25.

67.     Kahn did not inform Wang or Xiong that Kahn had received a wire from the Franchise Tax Board for $136,530 representing Wang's 2017 state tax refund.  Tr. at 192:16-25.

68.     Kahn kept the $136,530 representing Wang's 2017 state tax refund that the Franchise Tax Board had wired.  Tr. at 192:16-193:3

69.     Neither Wang nor Xiong approved of or had any knowledge that Kahn had kept the $136,530 representing Wang's 2017 state tax refund.  Tr. at 117:16-118:1, 192:16-193:3, 198:1-13.

70.     In or around April 2019, the Franchise Tax Board mailed a check for $136,530 representing Wang's 2018 California state tax refund to an address maintained by Kahn and FPG.  Tr. at 406:15-21; Pet. Ex. 38.

71.     Neither Longstaff nor Kahn informed Wang or Xiong when Kahn received the $136,530 check representing Wang's 2018 state tax refund.  Tr. at 194:12-197:9, 221:15-222:10.

72. In or around September 2019, the U.S. Treasury mailed a check for $593,851 representing Wang's 2018 federal tax refund to an address maintained by Kahn and FPG. Tr. at 407:2-8; Pet. Ex. 38.

73. Neither Longstaff nor Kahn informed Wang or Xiong when Kahn received the $593,851 check representing Wang's 2018 federal tax refund. Tr. at 194:12-197:9, 221:15-222:10.

74. On October 16, 2019, Kahn sent Greg Xiong and Suhua Xiong an email stating "We've had Youlin's $450k plus additional tax refunds to pay our fees in our hand for 10 days plus. Derek and some lawyer in NY, a Liao are trying to cram down our existing fee agreements on this 2018 to nothing." Pet. Ex. 42.

75. Prior to receiving the email from Kahn on October 16, 2019, Xiong was not aware of any purported fees owed to Kahn or his company or of any fee agreements with Kahn or his company. Tr. at 193:21-194:11, 198:22-199:22; Pet. Ex. 43.

76. After Xiong received Kahn's email, Xiong spoke to Kahn on the phone and informed Kahn that Xiong was not aware of any fees or fee agreements and asked Kahn to send Xiong the purported fee agreements. Tr. at 198:22-199:22.

77. Kahn told Xiong during their phone call that Kahn could only send Xiong the purported fee agreements with Longstaff's permission. Tr. at 198:22-199:22.

78. In text messages to Longstaff on October 16 and 17, 2019, Kahn threatened to send the purported fee agreements to Xiong unless Longstaff paid Kahn's fees. Tr. at 414:17-23, 416:25-417:12; Pet. Exs. 43, 62.

79. Kahn did not send Xiong any purported fee agreements after that call. Tr. at 200:22-25.

80. On October 17, 2019, after Xiong had informed Longstaff of his call with Kahn, Longstaff sent Xiong an email stating that Kahn had received the two checks representing Wang's 2018 state and federal tax refunds and had refused to release them unless Wang paid Kahn hundreds of thousands of dollars. Tr. at 204:8-13; Pet. Ex. 39.

81. Longstaff attached a copy of the RDS, which included the arbitration provision, to

1  that email and stated that the RDS was "the ONLY signed document between FPG and me of
2  which I am aware." Pet. Ex. 39.

3      82.    Xiong noticed that the RDS stated that it was "an attachment and becomes part of
4  the Retainer and Fee Agreement dated 8/16/2018" and asked Longstaff to send Xiong the
5  referenced Retainer and Fee Agreement. Tr. at 206:23-207:23; Pet. Ex. 40.

6      83.    On October 18, 2019, Longstaff sent Xiong a two-page document called a
7  "Partially Deferred Retainer and Fee Agreement" dated August 16, 2018. Longstaff did not
8  include the signature page. Pet. Ex. 41.

9      84.    Longstaff told Xiong that Longstaff had entered into a fee agreement with Kahn
10 that included a charge of a few thousand dollars per tax return. Longstaff said that the fee
11 agreement also contained a contingent charge for a percentage of tax refunds recovered but that
12 this charge was not applicable because it was only triggered if Kahn or FPG provided certain
13 separate tax shelter vehicles. Pet. Ex. 41.

14     85.    The terms of the Partially Deferred Retainer and Fee Agreement that Longstaff sent
15 Xiong appeared to be consistent with what Longstaff's email stated, i.e., that any contingent fee
16 was triggered only upon use of a tax shelter created by Kahn. Tr. at 218:14-221:6; Pet. Ex. 41.

17     86.    Prior to receiving Longstaff's email on October 18, 2019, Xiong had never seen a
18 contract called a Retainer and Fee Agreement. Tr. at 206:23-207:23.

19     87.    The version of the Partially Deferred Retainer and Fee Agreement that Longstaff
20 sent Xiong on October 18, 2019, was doctored and was not the version that Longstaff had
21 executed on August 16, 2018. Pet. Exs. 1, 41.

22     88.    Longstaff told Xiong that Longstaff had negotiated with Kahn and that Kahn
23 agreed to release the $593,851 federal tax refund check and $136,530 state tax refund check if
24 Wang paid Kahn $107,500. Tr. at 221:7-222:10.

25     89.    On or about October 21, 2019, Xiong wired $107,500 to Kahn on Longstaff's
26 advice to obtain release of Wang's 2018 tax refund checks. Tr. at 221:7-222:10; Pet. Ex. 41; Kahn
27 Ex. 154.

28     90.    At the time that Xiong wired $107,500 to Kahn, neither Xiong nor Wang had full

United States District Court
Northern District of California

knowledge of the facts and the material terms of the PDRFA Agreements because the doctored version of the PDRFA that Longstaff provided Xiong was different from the actual August 16, 2018, PDRFA in several ways: 1) the version Xiong received made no reference to the forged November 2017 POA; 2) the version Xiong received stated a lower contingent fee percentage than the actual PDRFA Agreement; 3) the version Xiong received stated that a contingent fee would only be owed if Wang used a tax shelter created by FPG, which had not occurred and therefore Xiong believed that no contingent fee was owed under the PDRFA Agreement; and 4) because there was no contingent fee owed under the conditions stated under the PDRFA that Xiong received, the doctored PDRFA only put Xiong on notice of fixed fees of $10,000 for the 2017 and 2018 tax returns.  Tr. at 217:13-221:6, 222:16-22; Pet. Exs. 1, 41.

91. At the time that Xiong wired $107,500 to Kahn, Longstaff told Xiong that Wang did not owe Kahn or FPG any money.  Tr. at 220:21-221:6.

92. Xiong only wired the $107,500 to Kahn under duress because he believed it was the only way to get Kahn to release Wang's 2018 tax refund checks.  Tr. at 221:15-222:10, 222:23-223:9, 225:15-226:18; Pet. Exs. 15, 41, 42.

93. Xiong did not know how long Kahn had been holding the 2018 tax refund checks and was worried that they might expire or that Kahn would void the checks or send them back to the government as Kahn had threatened to do in an email.  Tr. at 194:12-197:9, 221:15-222:15; Pet. Ex. 42.

94. Kahn did not send the $593,851 federal tax refund check to Longstaff until summer 2020, more than 6 months after Xiong had wired $107,500 to Kahn to obtain release of Wang's 2018 tax refund checks.  Tr. at 228:1-17, 463:9-11.

95. The accounting firm Abbott, Stringham and Lynch examined Wang's 2017 and 2018 tax returns and confirmed that the 2017 and 2018 tax returns were incorrect.  Tr. at 248:2-249:3; Pet. Exs. 9, 11, 22, 24.

96. In or around August 2021, Wang submitted by mail his amended federal and state tax returns for the 2017 tax year.  Pet. Exs. 9, 10.

97. In or around October 2021, Wang submitted by mail his amended federal tax return

11

for the 2018 tax year.  Pet. Exs. 11.

98. Wang was required to amend the returns prepared by Kahn and FPG to correct and reverse the substantial understatement of Wang's capital gains from the sale of the Magnolia properties to pay the correct taxes on those sales.  Tr. at 238:25-240:1, 240:19-241:3, 245:17-246:15, 248:2-249:3, 250:12-251:4, 251:16-252:7, 253:9- 254:10; Pet. Exs. 9-11, 22-25.

99. Wang paid approximately $20,000 to the accounting firm Abbott, Stringham & Lynch to prepare the amended returns.  Tr. at 248:11-16.

100. Wang's amended tax returns acknowledge on their face the understatement of capital gains on the Magnolia properties on the original returns.  Tr. at 238:25-240:1, 240:19-241:3, 245:17-246:15, 250:12-251:4, 251:16-252:7, 253:9-254:10; Pet. Ex. 9 at MAGNOLIA 000046, MAGNOLIA 000064; Pet. Ex. 11 at MAGNOLIA 000271, MAGNOLIA 000293; Pet. Ex. 22 at MAGNOLIA 001361, MAGNOLIA 001368; Pet. Ex. 24 at MAGNOLIA 001376, MAGNOLIA 001383.

101. There is insufficient evidence to establish who was at fault for the understatement of Wang's capital gains.  Tr. at 238:25-240:1, 240:19-241:3, 245:17-246:15, 250:12-251:4, 251:16- 252:7, 253:9-254:10, 282:3-289:19; Pet. Ex. 9 at MAGNOLIA 000046, MAGNOLIA 000064; Pet. Ex. 11 at MAGNOLIA 000271, MAGNOLIA 000293; Pet. Ex. 22 at MAGNOLIA 001361, MAGNOLIA 001368; Pet. Ex. 24 at MAGNOLIA 001376, MAGNOLIA 001383; Kahn Ex. 126.

102. On November 6, 2019, Xiong notified Longstaff that he was terminated as counsel for Wang in any capacity, including with respect to Magnoliadrhomes LLC, one of Wang's companies, and would be replaced by Morgan Lewis & Bockius LLP.  Tr. at 230:7-22; Pet. Ex. 46.

103. On December 4, 2019, Xiong confirmed to Longstaff that Xiong had terminated Longstaff from all legal matters related to Wang or any of Wang's companies and that Longstaff should stop completing any tasks on Wang's behalf.  Tr. at 232:15-233:14; Pet. Ex. 47.

104. FPG and Kahn initiated the Arbitration on or about November 20, 2019.  Pet. Ex. 16.

105. Neither Kahn nor FPG gave notice of the Arbitration to Wang or Xiong. Tr. at 118:24-119:10, 233:18-24, 237:13-15, 242:4-21.

106. Longstaff purported to act as Wang's attorney-in-fact and attorney-at-law in the Arbitration. Tr. at 397:12-19; Pet. Ex. 17.

107. On December 10, 2019, Longstaff purported to file an answer and counterclaims on Wang's behalf in the Arbitration. Tr. at 397:12-19; Pet. Ex. 17.

108. Longstaff purported to participate in arbitrator selection on Wang's behalf in the Arbitration. Tr. at 401:17-24, 402:6-9.

109. Longstaff purportedly suggested that Kahn and FPG amend their claims in the Arbitration to add claims of more than $10 million against Wang, which Kahn and FPG did. Tr. at 399:7-14, 401:3-16; Pet. Ex. 52.

110. Neither Wang nor Xiong authorized Longstaff to represent Wang in the Arbitration. Tr. at 119:11-13, 230:7-22, 232:15-233:17; Pet. Exs. 46, 47.

111. Neither Wang nor Xiong learned of the Arbitration until mid-September 2020. Tr. at 118:24-119:10, 233:18-24, 236:2-21, 237:13-15; Pet. Ex. 54.

112. Wang and Xiong had no knowledge of the Arbitration prior to mid-September 2020. Tr. at 118:24-119:10, 233:18-24, 236:2-21, 237:13-15; Pet. Ex. 54.

113. In October 2020, shortly after Wang and Xiong learned about the Arbitration, Grellas Shah LLP specially appeared in the Arbitration on behalf of Wang to inform the arbitrator that Wang objected to arbitral jurisdiction. Kahn Ex. 128.

114. In December 2020, Wang specially appeared in the Arbitration to request permission to file a motion to stay pending resolution of the petition to enjoin arbitration that Wang had filed in this Court. Wang again stated that there was no arbitral jurisdiction because the purported contract containing the arbitration clause never came into existence. Wang specifically stated that he was not asking the arbitrator to rule on the issue of arbitrability. Wang also stated that he had filed this action in federal court. Kahn Ex. 128.

**IV. CONCLUSIONS OF LAW**

1. This Court has subject matter jurisdiction over Wang's claims under the Federal

13

Arbitration Act. *See* 9 U.S.C. § 4.

2. The Court has personal jurisdiction over Kahn because (1) Kahn purposefully directed his activities at residents of this forum and purposefully availed himself of the privilege of doing business in the forum; (2) Wang's claims arise out of or relate to those activities; and (3) the assertion of personal jurisdiction is reasonable and fair. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Kahn does not dispute personal jurisdiction. ECF No. 192.

3. Venue is proper because a substantial part of the events giving rise to the Petition occurred in this judicial district. *See* ECF No. 68 at 38-42 (finding venue in this district to be proper); 28 U.S.C. § 1391(b)(2) (stating venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"); *Kremen v. Cohen*, No. 5:11-cv-05411-LHK, 2012 WL 44999, at *9 (N.D. Cal. Jan. 7, 2012) ("Venue may be proper in multiple districts so long as a 'substantial part' of the underlying events took place in each of those districts.").

4. When a purported party to a contract containing an arbitration provision contends the contract itself is void or was never formed, a court, not an arbitrator, must determine the contract's validity. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991).

5. There is no waiver of a challenge to arbitral jurisdiction "where a party objects to arbitrability but nevertheless voluntarily participates in the arbitration proceedings." *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1510 (3d Cir. 1994).

6. The Ninth Circuit has identified two ways to preserve arbitrability issues for judicial review: "a party may (1) 'object[ ] to the arbitrator's authority, refuse[ ] to argue the arbitrability issue before him, and proceed [ ] to the merits of the grievance'; or (2) 'make[ ] an objection as to jurisdiction and an express reservation of the question on the record.'" *Van Waters & Rogers Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. Union 70*, 913 F.2d 736, 740 (9th Cir. 1990) (quoting *George Day Const. Co. v. United Bhd. of Carpenters & Joiners of Am., Loc. 354*, 722 F.2d 1471, 1475 (9th Cir. 1984)).

7. Wang properly preserved arbitrability issues for judicial review. Findings of Fact Nos. 112, 113.

8. Kahn, as the party seeking to compel arbitration, has the burden of proving the existence of a valid agreement to arbitrate by a preponderance of the evidence. *See Camacho v. Control Group Media Co., LLC*, No. 21-cv-1954-MMA (MDD), 2022 WL 3093306, at *4 (S.D. Cal. July 18, 2022).

9. Wang did not sign the PDRFA Agreements or intend to enter into them. Findings of Fact Nos. 20-25.

10. Wang did not enter into the PDRFA Agreements under the doctrine of actual agency because he did not authorize Longstaff to enter into the PDRFA Agreements and because the power of attorney pursuant to which Longstaff purported to sign the contract on Wang's behalf was forged. Findings of Fact Nos. 16-17, 21-23.

11. The doctrines of apparent authority or subsequent ratification are affirmative defenses for which Kahn bears the burden of proof. *See Rayonier, Inc. v. Polson*, 400 F.2d 909, 922-23 (9th Cir. 1968); *Glaski v. Bank of Am.*, 218 Cal. App. 4th 1079, 1097 n.16 (2013).

12. "Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Hanson v. Am. W. Airlines, Inc.*, 544 F. Supp. 2d 1038, 1043 (C.D. Cal. 2008) (quoting *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750, 756 (9th Cir. 1969)). "Only the acts of the principal, not of the agent, give rise to apparent authority." *Id.*

13. "An attorney's apparent authority concerns 'that which attorneys are normally authorized to do in the course of litigation manifested by the client's act of hiring an attorney' and 'actual authority implied in law.'" *Camacho*, 2022 WL 3093306, at *8 (quoting *Blanton v. Womancare, Inc.*, 38 Cal. 3d 396, 404 (1985)).

14. "[A]bsent express authority, it is established that an attorney does not have implied plenary authority to enter into contracts on behalf of his client." *Blanton*, 38 Cal.3d at 407 (alteration in original) (quoting *Wilson v. Eddy*, 2 Cal. App. 3d 613, 618 (1969)).

15. "[A]n attorney, merely by virtue of his employment as such, has no apparent

15

authority to bind his client to an agreement for arbitration." *Blanton*, 38 Cal.3d at 407.

16. Authority, whether actual or apparent, must exist at the time the agent acted. If such authority did not exist at the time of the action, then subsequent ratification is required to validate the unauthorized acts. *See* Cal. Civ. Code § 2307 (providing that subsequent ratification is required if there was not precedent authorization).

17. Wang did not communicate with Kahn prior to Longstaff's execution of the PDRFA Agreements on August 16, 2018, or take any action that would have led Kahn to reasonably believe that Longstaff had authority to enter into the PDRFA Agreements on Wang's behalf. Findings of Fact Nos. 24, 25.

18. Because Kahn claims he did not believe Xiong had authority to act on Wang's behalf through at least June 2020, Xiong's actions cannot be imputed to Wang, the principal, to determine Kahn's reasonable beliefs regarding Longstaff's authority to act for Wang in August 2018 when Longstaff executed the contract. Findings of Fact No. 26.

19. Kahn's trip to Beijing in November 2018 and Wang's execution of the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China," could not have created apparent authority for Longstaff to enter into the PDRFA Agreements because the PDRFA Agreements were executed in August 2018, over two months before the Beijing trip. Findings of Fact Nos. 18, 26, 35; Cal. Civ. Code § 2307 (providing that subsequent ratification is required if there was not precedent authorization).

20. Wang cannot be deemed to have assented under the doctrine of ratification to the formation of the contract containing the arbitration agreement because Wang did not have "full knowledge of the facts or terms of the contract" prior to any voluntary payment made to Kahn. *Blen v. Bear River & Auburn Water & Mining Co.*, 20 Cal. 602, 606 (1862) ("A ratification, to be binding, must be with a full knowledge of the facts or terms of the contract."); *see also Burgoon v. Narcanon of N. Cal.*, 125 F. Supp. 3d 974, 986 (N.D. Cal. 2015) (requiring the party seeking to enforce a purported agreement to arbitrate to prove specific knowledge of the arbitration provision); *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II, LLP*, No. CV 10–8833-VBF(FMOx), 2011 WL 13217759, at *2 (C.D. Cal. Aug. 8, 2011) (explaining that

16

"ratification requires that the principal have full knowledge of his rights and circumstances, and the acts of the agent"); Tr. at 536:18-24 (admitting that there is no evidence that Wang or Xiong was aware of the arbitration agreement during the relevant timeframe); Findings of Fact Nos. 27, 36, 38-40, 74-87, 90.

21. For every payment that Kahn or FPG received prior to Xiong's wire of $107,500 to Kahn on or about October 21, 2019, Xiong and Wang were unaware of the existence of the PDRFA Agreements or any contract involving an arbitration agreement. Findings of Fact Nos. 27, 36, 38-40, 63, 65, 67, 69, 74-87, 90.

22. At the time that Xiong wired $107,500 to Kahn on or about October 21, 2019, Xiong was unaware of the material terms of the PDRFA Agreements and had received a doctored version of the PDRFA that led him to believe that no contingent fee was owed, but he was aware of the RDS Agreement that included the arbitration provision. Findings of Fact Nos. 27, 36, 38-40, 74-87, 90-96.

23. Wang cannot be deemed to have assented under the doctrine of ratification to the formation of the contract containing the arbitration agreement because Wang did not take any actions that would constitute ratification while having knowledge of the arbitration agreement. Ratification occurs only when the principal engages in "unequivocal conduct giving rise to an inference that he intended his conduct to amount to a ratification." *Changzhou AMEC E. Tools and Equip. Co., Ltd. v. E. Tools & Equip., Inc.*, No. EDCV 11–00354 VAP (DTBx), 2012 WL 3106620, at *17 (C.D. Cal. July 30, 2012) (quoting *Union Pac. R. Co. v. Zimmer*, 87 Cal. App. 2d 524, 532 (1948)).

24. The two payments totaling $10,000 that Kahn received in August 2018 from the funds Libkey was supposedly holding in trust for Wang and Magnolia do not support the doctrine of ratification because the principal, Wang, was not aware of and did not approve the payments and therefore could not have intended the payments to amount to a ratification. *See Changzhou*, 2012 WL 3106620 at *17; Findings of Fact Nos. 62-63, 68-70, 72, 74-76.

25. The $161,024 payment that Kahn received in November 2018 from the funds Libkey was supposedly holding in trust for Magnolia does not support the doctrine of ratification

1  because the principal, Wang, was not aware of and did not approve the payment and therefore
2  could not have intended the payment to amount to a ratification.  *See Changzhou*, 2012 WL
3  3106620 at *17; Findings of Fact Nos. 49-50, 55-57, 59, 64-65.

4      26.    The October 2018 Franchise Tax Board wire of $136,530 representing Wang's
5  2017 state tax refund, which Kahn kept for himself as purported fees, does not support the
6  doctrine of ratification because the principal, Wang, was not aware of and did not approve Kahn's
7  retaining of the refund payment and therefore could not have intended Kahn's retaining of the
8  refund payment to amount to a ratification.  *See Changzhou*, 2012 WL 3106620 at *17; Findings
9  of Fact Nos. 66-69.

10      27.    Xiong's wire of $107,500 to Kahn on or about October 21, 2019, does not support
11  the doctrine of ratification because Xiong did not make the payment to affirm the contract but
12  rather made the payment under duress to obtain release of Wang's $593,851 federal tax refund
13  check and $136,530 state tax refund check that Kahn was withholding and had threatened to void
14  and send back to the government.  *See Changzhou*, 2012 WL 3106620 at *18 (explaining that a
15  payment made under duress is not voluntary and cannot constitute ratification); Findings of Fact
16  Nos. 74, 80, 88-93.

17      28.    Receipt of the benefits of a contract cannot constitute ratification unless the
18  principal "had actual knowledge of the specific contract out of which the benefits arose."  *Com.*
19  *Lumber Co. v. Ukiah Lumber Mills*, 94 Cal. App. 2d 215, 220 (1949).

20      29.    Kahn did not prove that Wang received any benefits under the contract because
21  Wang had to refile his tax returns due to a gross understatement of his capital gains.  Findings of
22  Fact Nos. 95, 98-101.  Kahn did not prove that the errors were caused by Wang's withholding of
23  information and Wang did not prove that Kahn mis-reported the income.  *Id.*

24      30.    But even if the tax refunds from the original tax returns prepared by Kahn and FPG
25  constituted benefits under the contract, Wang's acceptance of the tax refunds does not support the
26  doctrine of ratification because Wang was not aware of the contract out of which the purported
27  benefit arose.  Findings of Fact Nos. 27, 36, 38-40, 74-87, 90.

28      31.    Wang's signing of the document titled "Richard Kahn personal meeting with Mr.

Youlin Wang for CAA in Beijing, China" does not support the doctrine of ratification because Wang and Xiong had no knowledge of the PDRFA Agreements and believed the power of attorney referenced in the document that Wang was supposedly affirming was the IRS Form 2848 Xiong had provided to Longstaff, as that was the only power of attorney Longstaff was ever provided on Wang's behalf. And though Kahn's stated purpose of having Wang sign the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China," was to confirm that Wang had authorized Longstaff to enter into the PDRFA Agreements in August 2018, Kahn did not show Wang the November 2017 POA or the PDRFA Agreements despite knowing that Longstaff had a POA on IRS Form 2848 from Wang. Also, Kahn did not disclose during the meeting the existence of any contract containing an arbitration clause or that by signing the document titled "Richard Kahn personal meeting with Mr. Youlin Wang for CAA in Beijing, China," Wang was agreeing to arbitrate any disputes that arose between Wang and Kahn or Kahn's company. Findings of Fact Nos. 12-17, 27, 30-42, 46, 74-87, 90.

32. Because Longstaff did not have actual or apparent authority to enter into the PDRFA Agreements, including the RDS Agreement that included the arbitration provision, on Wang's behalf and Wang did not ratify the PDRFA Agreements, the PDRFA Agreements were not formed, and there is no agreement to arbitrate. *See AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" (citation omitted)); *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211-14 (9th Cir. 2016) (holding that there was no arbitral jurisdiction under Chapter 2 of the FAA because the contract containing the arbitration clause was a "mere sham").

33. The Arbitration must therefore be permanently enjoined under because (1) Wang will suffer irreparable injury if forced to participate in an arbitration he has not agreed to submit to; (2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between Wang and Kahn, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. 9 U.S.C. § 4; *see W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013).

V.   **ORDER**

1.   The Court finds FOR Petitioner Youlin Wang and AGAINST Respondent Richard Kahn; and

2.   A Judgment and a Permanent Injunction enjoining Respondents from prosecuting claims against Wang in arbitration proceedings shall issue. Specifically, Respondents Richard Kahn and FPG are enjoined from continuing the arbitration in Miami, Florida before the American Arbitration Association in Case No. 01-19-004-1076 or from initiating any arbitral proceedings pursuant to the PDRFA Agreements identified in this Order.

Dated:  June 30, 2023

*[signature]*

BETH LABSON FREEMAN
United States District Judge